2025R00656/BAC

**FILED**

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

AUG 2 7 2025

4:45 pm

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Michael A. Shipp, U.S.D.J. |
| | : | CLERK, U.S. DISTRICT COURT - DNJ |
| v. | : | Crim. No. 25-519 |
| | : | |
| JEFFREY SPOTTS | : | Count One |
| | : | 18 U.S.C. § 1349 |
| | : | (Conspiracy to Commit |
| | : | Wire Fraud) |
| | : | |
| | : | Count Two |
| | : | 18 U.S.C. § 1343 |
| | : | 18 U.S.C. § 2 |
| | : | (Wire Fraud) |
| | : | |
| | : | Count Three |
| | : | 18 U.S.C. § 371 |
| | : | (Conspiracy to Commit |
| | : | Securities Fraud) |
| | : | |
| | : | Count Four |
| | : | 15 U.S.C. §§ 78j(b) and 78ff |
| | : | 17 C.F.R. § 240.10b-5 |
| | : | 18 U.S.C. § 2 |
| | : | (Securities Fraud) |

## I N D I C T M E N T

The Grand Jury in and for the District of New Jersey, sitting at Newark, charges as follows:

## COUNT ONE
### (Conspiracy to Commit Wire Fraud)

### Overview

1.     From in or around January 2015 to in or about March 2020, defendant Jeffrey Spotts ("SPOTTS") conspired with John Hughes ("Hughes") and Co-conspirator-1 to defraud dozens of investors ("investors" or "Victims") who had

invested approximately $360 million in funds managed by Prophecy Asset Management LP ("Prophecy"), through lies, deception, misleading statements, and material omissions relating to, among other things: (a) the purported low-risk, transparent, and diversified nature of Prophecy's funds; (b) the manner and purpose in which SPOTTS, Hughes, and Co-conspirator-1 used money from those funds; and (c) the financial position of Prophecy's funds leading up to its collapse in or around March 2020.

## Background

2.     At all times relevant to this Indictment:

a.     Prophecy Trading Advisors International Ltd (the "Fund") was an investment company having a place of business in Tortola, British Virgins Islands.

b.     Prophecy Trading Advisors Master Fund, LP (the "Master Fund") (together with the Fund, the "Funds") was a Cayman Islands limited partnership that was formed for the purpose of investing and trading in securities and financial instruments.

c.     Prophecy was a Delaware limited partnership and a registered investment adviser that served as the investment manager to the Funds. Prophecy's principal offices were located in South Carolina and New York.

d.     SPOTTS resided in Summit, New Jersey and was Prophecy's Chief Executive Officer ("CEO"), portfolio manager, and co-founder. Along with Hughes, SPOTTS co-managed Prophecy and the Funds primarily from his New

2

Jersey residence.

   e. Hughes resided in Mahwah, New Jersey, and was Prophecy's Chief Operating Officer, Chief Compliance Officer, and other co-founder. Hughes comanaged Prophecy and the Funds from his residence and from Prophecy's offices in New York.

   f. The Fund invested all of its investable assets in the Master Fund, subject to oversight by the Fund's board of directors made up of SPOTTS, Hughes, and a sole outside director, who was based in Bermuda.

   g. Co-conspirator-1 was an investment manager (called a "sub-advisor") for Prophecy who was supposed to invest capital from the Funds pursuant to Prophecy's "first-loss" investment model, discussed below. Since in or around 2019, Co-conspirator-1 was also the CEO and President of a large public company ("Company-1") that owned and managed large and diversified retail franchises.

   h. The Victims were domestic and foreign investors in the Funds, located in New Jersey, and elsewhere, and included, among others, institutional entities, pension plans, family trusts, and high net-worth individuals.

## The Conspiracy

3.     From in or around January 2015 to in or around March 2020, in Union County, in the District of New Jersey, and elsewhere, defendant

**JEFFREY SPOTTS**

did knowingly and intentionally conspire and agree with others to devise a scheme and artifice to defraud investors and potential investors and to obtain money and property from them by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, transmitted and caused to be transmitted by means of wire communications in interstate and foreign commerce, certain signs, signals, and sounds, contrary to Title 18, United States Code, Section 1343.

## Goal of the Conspiracy

4.     The goal of the conspiracy was for SPOTTS, Hughes, and Co-conspirator-1 to enrich themselves by obtaining hundreds of millions of dollars of Victims' funds through false and misleading statements and material omissions regarding (a) the low-risk and diversified nature of the Funds, (b) how Victims' investments would be used, and (c) the Funds' profitability.

## Manner and Means of the Conspiracy

5.     It was part of the conspiracy that:

***Prophecy's False Claims of Low-Risk and Transparent Investment Opportunities***

a.     From in or around January 2015 to in or around March 2020,

SPOTTS and Hughes fraudulently marketed the Funds to prospective investors as a safe, diversified, and low-risk investment opportunity. SPOTTS and Hughes claimed that the Funds offered access to a "first-loss" trading strategy that purportedly worked as follows:

      i.    Investor money was allocated to a diverse array of traders, called sub-advisors, who were sophisticated investors with proven track records of successful investing. Sub-advisors were incentivized to generate profits because they were permitted to keep a percentage of their gains. In turn, Prophecy charged sub-advisors an administrative fee to access the Funds' capital.

      ii.    In order to gain access to the investors' pooled money, sub-advisors had to provide cash collateral equal to approximately 10% of the money they sought to invest. For example, if a sub-advisor provided cash collateral of $1 million, Prophecy would allocate $10 million from the Funds to the sub-advisor who would then trade in liquid assets and equities of their choosing.

      iii.    If a sub-advisor began to experience trading losses, Prophecy would use the sub-advisor's cash collateral to offset the losses. If the sub-advisor's losses approached the amount of their cash collateral, Prophecy would contact the sub-advisor to replenish the sub-advisor's cash collateral, and, if necessary, suspend allocations and trading, or even terminate the sub-advisor if losses were substantial.

      iv.    In addition to tracking the cash collateral, to ensure

transparency, Prophecy monitored and tracked the sub-advisors' trading on a real-time, day-to-day basis using a proprietary trading platform. The proprietary platform enabled Prophecy to track a sub-advisor's trading and quickly determine whether the sub-advisor was experiencing losses and then offset those losses or suspend or terminate allocations and trading if losses exceeded a sub-advisor's cash deposit.

        v.    Sub-advisors' trading was mostly in liquid markets, and almost all positions across the Funds could be liquidated in less than a day without significantly impacting prices. One of the Funds' main selling points was the ability of Prophecy to identify and liquidate sub-advisor positions quickly if a sub-advisor's losses were encroaching on his or her cash collateral.

        vi.    Prophecy had the authority and capability to shut down a sub-advisor's ability to enter orders and take control over the management of a sub-advisor's trading positions.

        vii.    To further reduce the risk and increase transparency, off-platform investments were restricted to 5% of the Funds' gross assets.

        viii.    An administrator oversaw the Funds on a monthly basis, and Prophecy and the Funds underwent yearly independent audits.

        ix.    Using this strategy, the Funds never had a down month, had continuous, positive returns, and no sub-advisor had ever exhausted his or her cash collateral.

        b.    These claims—which SPOTTS and Hughes used to solicit and

induce investors—were materially false and misleading. For example, in reality:

      i.     Prophecy did not use a diverse array of sub-advisors. Rather, over time, without informing investors, SPOTTS and Hughes allocated over 78% of the Funds' capital to numerous different trading entities, each overseen and controlled by a single sub-advisor, Co-conspirator-1.

      ii.     Over time, Co-conspirator-1 suffered cumulative trading losses that reached approximately $294 million by in or around March 2020. As these losses escalated, SPOTTS and Hughes continued to provided Co-conspirator-1 with allocations from the Funds and did not require Co-conspirator-1 to provide cash collateral to back Co-conspirator-1's losses. Additionally, SPOTTS and Hughes never suspended or terminated Co-conspirator-1's allocations or trading.

      iii.     Cash collateral deposits were significantly lower than 10% of the allocations made from the Funds. In fact, in or around the mid-2018, less than 2% of Prophecy's gross assets were backed by first-loss cash deposits, and by in or around July 2019 that number had decreased to less than 1%.

      iv.     SPOTTS and Hughes invested up to 20% of the Funds' gross assets in off-platform investments, without notifying the Victims.

      c.     SPOTTS and Hughes fraudulently concealed all of this and other information from Victims, causing Victims to believe their investments were far more secure than they actually were.

*Fraudulent Concealment of Co-conspirator-1's Losses*

d.    Over time, Co-conspirator-1 sustained substantial trading losses that ultimately wiped out the Funds. These loses increased year over year so that by in or around March 2020, Co-conspirator-1 had cumulative trading losses of approximately $294 million. As these repeated losses accumulated, SPOTTS and Hughes did not stop Co-conspirator-1 from trading or require Co-conspirator-1 to maintain cash collateral to offset and back the losses.

e.    SPOTTS, Hughes, and Co-conspirator-1 fraudulently concealed Co-conspirator-1's losses and cash collateral deficits by, among other things: (i) engaging in secret "round-trip" transactions that siphoned off cash from the Funds and gave it to Co-conspirator-1 who then fraudulently used it to replenish Co-conspirator-1's cash collateral and obtain more investment money from the Funds; (ii) allowing Co-conspirator-1 to use purported non-cash collateral, such as stocks, to offset Co-conspirator-1's losses and secure allocations from the Funds, without disclosing that information to Victims; and (iii) failing to disclose to Victims and auditors that Co-conspirator-1 was allowed to provide non-cash collateral without having Prophecy take steps to verify if that non-cash collateral had any actual value.

f.    *Secret "Round-Trip" Transaction:* By in or around October 2017, Co-conspirator-1 had a cash collateral deficit of approximately $19 million based on the amount of money he had been allocated to invest from the Funds. According to the representations SPOTTS and Hughes made to Victims, Prophecy

should have suspended Co-conspirator-1's trading until he provided additional cash collateral. Instead, SPOTTS and Hughes fraudulently engaged in the following series of transactions that used investor money from the Funds to replenish Co-conspirator-1's cash collateral:

        i.     In or around November 2017, SPOTTS and Hughes entered into a sham loan agreement with Co-conspirator-1, whereby they purported to use money from the Funds to loan approximately $11 million to a company that Co-conspirator-1 owned ("Company-2"). Based on the purported loan, Co-conspirator-1 caused Company-2 to engage in two transfers totaling approximately $10 million to another entity that Co-conspirator-1 owned ("Entity-1"). Co-conspirator-1 then wired the approximately $10 million in two separate transactions from Entity-1 back to Prophecy and designated it as a new cash collateral contribution.

        ii.     SPOTTS and Hughes failed to disclose the fraudulent "round-trip" transactions to Victims.

        iii.     SPOTTS and Hughes also concealed these transactions from the Funds' administrator and auditor by, among other things, having Co-conspirator-1 forge the signature of a former Company-2 colleague on the $11 million loan agreement and telling the administrator and auditor that the loan was a legitimate investment.

        g.     ***Non-Cash Collateral:*** From in or around 2015 through in or around 2019, Co-conspirator-1 did not provide sufficient cash collateral to secure Co-

conspirator-1's allocations from the Funds. During this period, Co-conspirator-1 continued to sustain substantial investment losses using money from the Funds. In response, SPOTTS and Hughes allowed Co-conspirator-1 to obscure Co-conspirator-1's allocations and disguise Co-conspirator-1's losses with non-cash collateral, like stocks and personal guarantees. Among other things, this allowed Prophecy to claim to its administrator and auditor that Co-conspirator-1's loses were offset by non-cash collateral that could be easily liquidated. In reality, however, the non-cash collateral was fake and otherwise worthless, and SPOTTS, Hughes, and Co-conspirator-1 conspired to conceal this fact from prospective investors and Victims.

      h.    ***The Non-Cash Collateral Was Worthless:*** SPOTTS and Hughes concealed from Victims and the auditor that Prophecy made no effort to verify that Co-conspirator-1's purported non-cash collateral had any actual value. In fact, virtually all of the non-cash collateral was fabricated and/or worthless. For example:

**Fake Preferred Stock Transfer**

      i.    By the end of in or around 2018, Co-conspirator-1 had cumulative trading losses in excess of $85 million. To reduce and offset these losses for Prophecy's year-end audit, Co-conspirator-1, SPOTTS, and Hughes created a fake preferred stock agreement that purported to grant Prophecy ownership of approximately $75 million of stock in a company ("Company-3") that Co-conspirator-1 controlled. The agreement was created in or around April 2019, but backdated to on or about January 1, 2018, to enable the stock to be recorded as a credit to the

Funds and an asset on the Funds' 2018 balance sheet.

ii.     Between April and June 2019, Co-conspirator-1 and Hughes exchanged additional drafts of the agreement in which the value of the shares ranged from $75 million to $150 million.

iii.     In or around June 2019, Co-conspirator-1 provided Hughes with approximately two Company-3 convertible stock certificates backdated to January 3, 2018, as proof of the ownership reflected in the preferred stock agreement. One of the certificates was for 75 shares with a purported valuation of approximately $75 million; the second certificate was for 150 shares with a purported valuation of approximately $150 million.

iv.     Hughes provided the Funds' auditor with the preferred stock agreement and the $75 million stock certificate, and, at the direction of SPOTTS and Hughes, Co-conspirator-1 falsely told the auditor that Company-3 had issued the preferred stock to Prophecy and that it was collateral to secure Co-conspirator-1 trading losses.

v.     In reality, Company-3 never issued the preferred stock, and the certificates were a complete fabrication created by Co-conspirator-1.

vi.     In or around June 2019, the Fund's administrator requested information confirming Co-conspirator-1's non-cash collateral in light of Co-conspirator-1's increasing trading losses. In response, Hughes provided the administrator with a second Company-3 Preferred Stock Agreement, now dated

11

January 1, 2019, granting Prophecy $150 million worth of preferred shares. These shares were a complete fabrication and did not exist.

### Fake Company-1 Stock Transfer

vii.    By the end of in or around 2019, Co-conspirator-1 had cumulative trading losses in excess of $192 million. To reduce and offset those losses for Prophecy's year-end audit, SPOTTS, Hughes, and Co-conspirator-1 created a limited partnership ("Company-4") and fraudulently agreed to have Co-conspirator-1 transfer to Company-4 approximately $194 million in Company-1 stock that Co-conspirator-1 owned. Company-4 then purportedly assigned the stock to Prophecy thereby offsetting the $192 million in losses caused by Co-conspirator-1.

viii.    In around December 2019, SPOTTS and Hughes falsely reported the transaction to the Funds' administrator as a fund investment, and SPOTTS and Hughes listed the transaction as an asset on Prophecy's balance sheet as of on or about December 31, 2019.

ix.    In reality, Co-conspirator-1 did not transfer any Company-1 stock to Company-4.

x.    In or around February 2020, to confirm Prophecy's end-of-month net asset value, the administrator requested an account statement showing the value of the shares purportedly transferred to Company-4. Hughes forwarded the administrator's request to Co-conspirator-1. On or about February 27, 2020, Co-conspirator-1 sent an account statement to the administrator falsely showing that the

12

value of Company-4's account was approximately $194 million as of on or about December 31, 2019 and on or about January 31, 2020.

xi.    While SPOTTS, Hughes, and Co-conspirator-1 were fabricating non-cash collateral, Co-conspirator-1 continued to sustain substantial trading losses. SPOTTS and Hughes did not disclose Co-conspirator-1's losses to Victims. In fact, in or around late February 2020, SPOTTS falsely concealed and misrepresented Co-conspirator-1's losses from investors. SPOTTS and Hughes also used the fabricated non-cash collateral to offset Co-conspirator-1's losses, falsely causing Prophecy to report profits every month.

### *Fraudulent Concealment of losses from Off-Platform Investments*

i.    Despite claiming to investors that Prophecy closely tracked its allocations through its proprietary software platform and restricted the use of the Funds for off-platform investments, SPOTTS and Hughes made numerous failed investments and loans that were off-platform that threatened to create substantial losses to the Funds. To conceal these potential losses, SPOTTS, Hughes, and Co-conspirator-1 engaged in a series of fraudulent transactions that were designed to give the appearance that the investments had been properly redeemed.  For example:

### **Off-platform Investment 1**

i.    From in or around December 2018, SPOTTS and Hughes used money from the Funds to make off-platform investments valued at approximately $24 million in a fund ("Company-5") managed by a Pennsylvania

investment advisor ("Individual-1").

        ii.    In or around the same time period, Company-5 was in financial distress. As a result, SPOTTS and Hughes attempted to redeem the total amount of the investment. The redemption failed, and they were only able to redeem approximately $6.5 million of the $24 million investment, leaving approximately $17.5 million in losses on the Funds' books.

        iii.    To conceal and clear this loss from the Funds' books, SPOTTS, Hughes, and Co-conspirator-1 agreed to engage in a series of transactions that made it appear that the investment had been legitimately purchased by an independent third-party, Company-2. In reality, Co-conspirator-1 secretly purchased the investment.

        iv.    In furtherance of that agreement, on or about May 23, 2019, Co-conspirator-1 wired approximately $17,579,885.15 to the Funds, the exact amount of the outstanding Company-5 investment.

        v.    To conceal Co-conspirator-1's purchase of the investment, SPOTTS directed Co-conspirator-1 to use Company-2 to purchase the investment from Prophecy.

        vi.    On or about June 12, 2019, Co-conspirator-1 emailed SPOTTS an agreement, backdated to April 1, 2019, assigning the interest in the investment to Company-2. To further hide Co-conspirator-1's involvement in the transaction, SPOTTS directed Co-conspirator-1 to forge the signature on the

14

agreement. Co-conspirator-1 forged the signature on the agreement using the first and middle names of Co-conspirator-1's minor child.

  vii. Pursuant to Company-5's limited partnership agreement, such assignments—even if legitimate—were prohibited. To get around this prohibition, SPOTTS and Hughes created a fake version of the limited partnership agreement that allowed for assignments, and they forged Individual-1's signature on that document.

  viii. Hughes provided these fake documents to the Funds' auditor to conceal from the auditor that the investment had been purchased by Co-conspirator-1.

**Off-platform Investment 2**

  ix. In or around October 2018, Co-conspirator-1 had a cash collateral deficit of approximately $50 million. Despite the cash collateral deficit, SPOTTS and Hughes provided an approximately $36 million unsecured loan to an asset management company controlled by Co-conspirator-1 ("Company-6" and the "Company-6 Loan"). SPOTTS and Hughes loaned Co-conspirator-1 the $36 million to provide rescue financing for a company in which Company-6 and Co-conspirator-1 were significantly invested.

  x. In or around December 2018, the loan matured, and Co-conspirator-1 failed to repay the loan. To conceal Co-conspirator-1's default, SPOTTS, Hughes, and Co-conspirator-1 engaged in a series of secret transactions.

xi.     On or about April 25, 2019, Co-conspirator-1 took an approximately $25 million loan from an investment banking company ("Company-7"). Co-conspirator-1 added approximately $2.5 million of Co-conspirator-1's own money and wired the $27.5 million to Prophecy as a partial payment of the Company-6 Loan.

xii.     On or about April 26, 2019, SPOTTS and Hughes caused Prophecy to wire approximately $17 million to a Co-conspirator-1 entity ("Entity-2"). Co-conspirator-1 then caused Entity-2 to wire approximately $8.5 million of the approximately $17 million to Company-6, and Company-6 to wire the approximately $8.5 million to Prophecy, completing the repayment to Prophecy, and the Funds, of the Company-6 Loan.

xiii.     On or about April 26, 2019, SPOTTS and Hughes caused Prophecy to wire an additional approximately $19 million to another Co-conspirator-1 entity ("Entity-3"). Co-conspirator-1 used the approximately $19 million and the remaining approximately $8.5 million held by Entity-2 to repay Co-conspirator-1 and Company-7.

xiv.     On paper it appeared that Company-6 had repaid its approximately $36 million loan. In reality, SPOTTS, Hughes, and Co-conspirator-1 fraudulently caused Prophecy to fund the repayment of its own loan to Company-6 with separate seemingly unrelated transfers to Co-conspirator-1's Entity-2 and Entity-3.

xv.     To conceal the true nature of the transactions, SPOTTS

and Hughes falsely claimed to the Funds' auditor that the transfers to Entity-2 and Entity-3 were new investments. Additionally, SPOTTS and Hughes failed to disclose to investors the true nature of the loan or the multiple transactions leading to its repayment.

### The Funds' Collapse

j.     Year after year, Co-conspirator-1 continued to suffer substantial trading losses, which were not disclosed to the Victims. Nonetheless, SPOTTS and Hughes continued to allow Co-conspirator-1 to trade and receive additional allocations from the Funds.

k.     In or about March 2020, the Funds' auditor resigned after uncovering SPOTTS's, Hughes's, and Co-conspirator-1's fraudulent activities.

l.     In total, as of in and around March 2020, the conspiracy and scheme to defraud caused the Victims to suffer losses in excess of approximately $294 million.

In violation of Title 18, United States Code, Section 1349

## COUNT TWO
(Wire Fraud)

1.      Paragraphs 1, 2, 4, and 5 of Count One of this Indictment are re-alleged here.

2.      On or about the date listed below, in Union County, in the District of New Jersey, and elsewhere, defendant

### JEFFREY SPOTTS

did knowingly and intentionally devise a scheme and artifice to defraud investors and potential investors, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice to defraud, did knowingly transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, the following writings, signs, signals, pictures, and sounds:

| Approximate Date | Description |
|---|---|
| February 28, 2020 | SPOTTS sent an interstate email communication to a Victim located outside New Jersey falsely concealing the nature and extent of Co-conspirator-1's losses |

In violation of Title 18, United States Code, Sections 1343 and 2.

18

## COUNT THREE
### (Conspiracy to Commit Securities Fraud)

1.     Paragraphs 1, 2, 4, and 5 of Count One of this Indictment are re-alleged here.

2.     From in or around January 2015 to in or around March 2020, in Union County, in the District of New Jersey, and elsewhere, defendant

### JEFFREY SPOTTS

did intentionally and knowingly, directly and indirectly, conspire and agree with others, by the use of the means and instrumentalities of interstate commerce, and of the mails, to use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, contrary to Title 15, United States Code, Sections 78j(b) and 78ff and Title 17, Code of Federal Regulations, Section 240.10b-5.

### Overt Acts

3.     In furtherance of the conspiracy and the illegal object thereof, the following overt acts, among others detailed above, were committed in the District of New Jersey and elsewhere:

a.     In or around November 2017, SPOTTS and Hughes caused Co-

conspirator-1 to forge the signature of a former Company-2 colleague on an approximately $11 million loan agreement to conceal Co-conspirator-1's involvement in the loan.

b.    On or about April 26, 2019, SPOTTS and Hughes caused Prophecy to wire approximately $17 million to Entity-2 to fraudulently eliminate part of Co-conspirator-1's defaulted $36 million loan.

c.    In or around June 2019, SPOTTS and Hughes caused Co-conspirator-1 to provide Hughes with two fake Company-3 convertible stock certificates backdated to January 3, 2018, falsely showing that the preferred stock had been issued to Prophecy to cover up Co-conspirator-1 losses.

d.    On or about June 12, 2019, SPOTTS and Hughes caused Co-conspirator-1 to forge the name of Co-conspirator-1's minor child on a fraudulent agreement, backdated to April 1, 2019, assigning the interest in an investment to Company-2 and concealing Co-conspirator-1's involvement in the transaction.

e.    On or about February 27, 2020, SPOTTS and Hughes caused Co-conspirator-1 to send a fabricated account statement to the administrator falsely showing that the value of Company-4's account was approximately $194 million.

In violation of Title 18, United States Code, Section 371.

## COUNT FOUR
(Securities Fraud)

1.    Paragraphs 1, 2, 4, and 5 of Count One and paragraph 3 of Count Three of this Indictment are re-alleged here.

2.    From in or around January 2015 to in or around March 2020, in Union County, in the District of New Jersey, and elsewhere, defendant

### JEFFREY SPOTTS

did knowingly and willfully, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, to use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons.

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.

## **FORFEITURE ALLEGATION**

1.      Upon conviction of the offenses charged in this Indictment, defendant JEFFREY SPOTTS shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses charged in Counts One through Four of this Indictment, and all property traceable thereto.

## **SUBSTITUTE ASSETS PROVISION**
## **(Applicable to All Forfeiture Allegations)**

2.      If any of the property described above, as a result of any act or omission of the defendant:

a.      cannot be located upon the exercise of due diligence;

b.      has been transferred or sold to, or deposited with, a third party;

c.      has been placed beyond the jurisdiction of the court;

d.      has been substantially diminished in value; or

e.      has been commingled with other property which cannot be divided without difficulty,

22

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of such defendant up to the value of the forfeitable property described above.

A TRUE BILL



FOREPERSON

TODD W. BLANCHE
U.S. Deputy Attorney General

ALINA HABBA
Acting United States Attorney
Special Attorney

Blake A. Coppotelli
Assistant United States Attorney

23

CASE NUMBER: 25-519 (MAS)

**United States District Court**
**District of New Jersey**

**UNITED STATES OF AMERICA**

v.

**JEFFREY SPOTTS**

**INDICTMENT FOR**

**18 U.S.C. § 1349**
**18 U.S.C. § 1343**
**18 U.S.C. § 371**
**15 U.S.C. §§ 78j(b) and 78ff**
**17 C.F.R. § 240.10b-5**
**18 U.S.C. § 2**

**A True Bill,**

**Foreperson**

TODD W. BLANCHE
U.S. DEPUTY ATTORNEY GENERAL

ALINA HABBA
ACTING UNITED STATES ATTORNEY
SPECIAL ATTORNEY

BLAKE COPPOTELLI
ASSISTANT U.S. ATTORNEY
NEWARK, NEW JERSEY
(973) 856-9095